UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ X
                                    :      11 Civ. 7565 (DLC)

ATLANTIC CASUALTY INSURANCE COMPANY,  :

                                 :     OPINION & ORDER

                Plaintiff,    :

                                 :

         -v-                    :

                                 :

VALUE WATERPROOFING, INC., a/k/a VALUE :
CONTRACTING, INC., a/k/a VALUE WATER  :
PROOFING, INC., GREENWICH INSURANCE    :
COMPANY, BULLARD PURCHASING AND SALES, :
INC., and KANSAS FRIED CHICKEN, INC., :

                Defendants.   :
------------------------------------ X

Appearances

For Plaintiff Atlantic Casualty:

Christopher Weldon
Debra Krebs
Robert Lewis
Keidel, Weldon & Cunningham LLP
925 Westchester Avenue
White Plains, NY 10604

For Defendant Value Waterproofing,
Inc.:

Timothy G. Griffin
Law Offices of Timothy G. Griffin
77 Pondfield Road
Bronxville, NY 10708

For Defendant Greenwich Insurance
Company:

Donald Sweetman
Gennet, Kallmann, Antin & Robinson,
P.C.
140 Broadway, Litman Suite, 38th Floor
New York, NY 10005

For Defendants Bullard Purchasing and
Sales, Inc. and Kansas Fried Chicken,
Inc.:

Barry S. Gedan
555 West 235th Street
Riverdale, NY 10463

DENISE COTE, District Judge:

This insurance coverage dispute arises out of a breach of
contract and negligence lawsuit pending in the New York Supreme
Court.  The plaintiff Atlantic Casualty Insurance Company
("Atlantic Casualty") seeks a declaratory judgment that it has
no duty to defend Value Waterproofing, Inc. ("Value") or to
indemnify Value in the underlying action.  Value asserts a
mirror counterclaim requesting a declaration that Atlantic
Casualty is required to defend Value in the underlying action
and to indemnify Value for any damages it may incur therein.
Value also asserts a counterclaim for breach of the insurance
contract.  Because Atlantic Casualty has been prejudiced by its
failure to receive timely notice of the claim and because
Value's work was not covered by its insurance policy, the
plaintiff's request for a declaratory judgment is granted.

PROCEDURAL HISTORY

Atlantic Casualty filed this declaratory judgment action on
October 26, 2011, against defendants Value, Greenwich Insurance
Company ("Greenwich"), Bullard Purchasing and Sales, Inc. and

2

Kansas Fried Chicken, Inc. ("KFC").[1]  Atlantic Casualty is the
insurer of Value, a company that performs construction work.
KFC is the owner of the property at which the claimed loss was
sustained and Greenwich is KFC's insurer.  On January 10, 2012,
defendant KFC asserted cross-claims against its insurer
Greenwich.  The Court has declined to exercise supplemental
jurisdiction over KFC's cross-claims against Greenwich.

Fact discovery concluded in October 2012.  Expert discovery
was conducted thereafter.  The parties submitted a Joint
Pretrial Order and proposed findings of fact and conclusions of
law in December 2012.  The trial in this case was conducted
without objection in accordance with the Court's customary
practices for the conduct of non-jury proceedings, which
includes the submission with the pretrial order of the direct
testimony of a party's witnesses by affidavit where those
witnesses are available to counsel.  The parties also served
copies of all the exhibits and deposition testimony that they
intended to offer as evidence in chief at trial.

At trial, the plaintiff presented affidavits constituting
the direct testimony of Luis Reyes ("Reyes"), a claims
investigator who performed work for Atlantic Casualty; Kim
Lawrence ("Lawrence"), an agent of the plaintiff's general

---

[1] Bullard Purchasing and Sales, Inc. has merged into KFC.

managing agency Green Mountain Agency, Inc. ("Green Mountain"); and construction expert Herbert Cannon ("Cannon").  The plaintiff also subpoenaed Lakhwinder Kaur ("Kaur"), an insurance broker with Value's brokerage firm NYC Guardian Brokerage Inc. ("NYC Guardian"); and Jimmy Sadiq ("Sadiq"), an employee of Value, to testify at trial.  Each of these witnesses appeared at trial and was cross-examined.  The plaintiff also offered excerpts from the deposition of Horace Bullard ("Bullard"), the President and owner of KFC.  The defendants offered counter-designations.

The defendant Greenwich presented an affidavit constituting the direct testimony of Frank Moore ("Moore"), the defendants' roofing expert.  Moore appeared at trial and was cross-examined. The parties agreed to accept portions of the report of Derrick Bartlett ("Bartlett"), an adjuster with U.S. Adjustment Corp., Greenwich's adjuster.  Bartlett did not testify at trial.

The nonjury trial was held in this action on January 9, 10, and 14, 2013.  This Opinion presents the Court's findings of fact and conclusions of law.  The findings of facts appear principally in the following Background section, but also appear in the remaining sections of the Opinion.  This Opinion concludes that Atlantic Casualty does not have a duty to defend Value in an underlying subrogation action and does not have a

duty to indemnify Value for any damages for which Value may be held liable in that action.

BACKGROUND

Atlantic Casualty is an insurance company that issued a commercial general liability insurance policy to defendant Value for the policy period from May 12, 2009 to May 12, 2010 (the "Policy").  Defendant KFC owns non-residential property located at 685 Lenox Avenue in New York ("the Property").  The building was a two story structure with a barrel vaulted roof.

Roof structures have a number of components.  The exterior component of the roof structure is an impermeable barrier that prevents water and other elements from penetrating the interior of the building.  The barrier rests on and is attached to the roof deck.  The roof deck is in turn held up by a support system of beams.  In this case, the barrel vaulted roof at the Property was supported by an assembly of beams called a bow truss.  The cross beam at the bottom of the bow truss is called the bottom chord.  Shortly before February 26, 2010, KFC hired Value to perform work on the bottom chord of the bow truss.  A piece of wood, alternately described at trial as capping, a bottom plate, or wood trim, had peeled away from the underside of the bottom chord.  The bottom chord was also cracked.  Sadiq and another individual inserted approximately four bolts or screws into the

bottom chord.  This repair work would typically be done by carpenters, but might be done by other workers as well.  Sadiq considered himself a carpenter; he was not a roofer.

A major snow storm in New York City occurred on February 25 and 26, leaving approximately 20 inches of snow on the roof.  On or about February 26 or 27, the roof collapsed.  KFC was aware of the collapse by February 27.  Carolos Martinez ("Martinez"), the employee of KFC who had asked Sadiq to repair the bottom chord, contacted Sadiq that same day to inform him of the collapse.  One or two days later, Martinez called Sadiq again to request Value's certificate of insurance.  Value obtained the certificate of insurance and provided it to KFC on March 9.  As Value requested, the certificate of insurance specified Bullard Purchasing and Sales, Inc., as the certificate-holder and 685-695 Lenox Avenue, NY, NY as the job location.  On March 1, Greenwich, KFC's insurer, also received notice of the partial collapse.  The Property was inspected by U.S. Adjustment Corp, an adjuster hired by Greenwich, on March 1, 2, 5 and 12.

Following the collapse of the roof, the New York City Department of Buildings ordered the demolition of the second floor of the Property.  Demolition activities began at the Property on March 3, continued on March 10, 12, and 16, and were completed on March 17, 2010.  On March 18, the New York City

Department of Housing Preservation confirmed that the demolition
had been completed on March 17.

On September 2, Greenwich sent a letter to Atlantic
Casualty notifying Atlantic Casualty of the collapse that had
occurred at the Property.  Atlantic Casualty received notice of
the collapse on or about September 8.  On September 9, a
Thursday, Atlantic Casualty asked R.M.G. Investigations, Inc.
("R.M.G."), a claims investigation company, to investigate the
collapse at the Property.  The following Monday, September 13,
Reyes, an investigator with R.M.G., contacted counsel for
Greenwich.  In an email to Greenwich's counsel on the same day,
Reyes requested photographs and documentation regarding the work
done by Value and the subsequent loss.  Reyes never received a
response from Greenwich's counsel.  Reyes also spoke with
Value's owner on September 13 and arranged a meeting with Sadiq
at his home for September 22.  On September 22, Reyes visited
the Property and learned that the entire roof had been removed
as well as the entire second story of the building.  On that
day, Reyes also spoke to Sadiq about the work Value performed at
the Property.  Then, on October 4, Atlantic Casualty instructed
R.M.G. to close its investigation; Atlantic Casualty had
determined that it was going to decline coverage.

Prior to the events described above, Value had procured

general commercial liability insurance.  Value contacted NYC
Guardian, a brokerage firm, in April 2009 to obtain an insurance
policy with Atlantic Casualty.  NYC Guardian filled out an
Accord Commercial Insurance Application ("Accord Application")
on behalf of Value based on information received from Value.
The Accord Application, which was submitted by NYC Guardian to
Green Mountain on April 24, 2009, requested coverage for 1)
Painting; 2) Masonry; 3) Drywall; and 4) Tiling.  Green Mountain
required Value to submit a signed and dated copy of the Accord
Application and a signed and dated supplemental application
("Supplemental Application").  In the Supplemental Application,
dated May 12, 2009, Value indicated that 100% of the
construction work it performed was remodeling construction work;
that 100% of the construction work it performed occurred inside
buildings; and that 100% of the construction work it performed
was residential as opposed to commercial.  Both the Accord
Application and the Supplemental Application were signed and
dated by Value's principal, Abdul Aziz ("Aziz").  The premiums
charged to Value for the coverage were based in part on Value's
representation that it engaged in only residential construction
work.  Had Value indicated that it engaged in construction work
on premises that are categorized as commercial, the premiums for
each classification covered by the Policy would have been 5-10%

higher.

In June 2009, Lawrence requested an inspection on Value's account.  An investigator interviewed Aziz on June 26.  During the interview, Aziz confirmed that Value was engaged in 100% residential construction work.  The inspection report noted, however, that Value was engaged in work on both the interior and exterior of buildings.  After receiving the inspection report, Lawrence sent a letter to NYC Guardian about issues raised by the inspection.  In particular, the letter mentioned that the report indicated that the insured had a part time employee, and engaged in stucco and waterproofing work.  The letter requested that NYC Guardian advise whether the stucco work was exterior stucco work and what type of waterproofing Value performed.  In response to this letter, Value sent Green Mountain a fax on July 10, 2009, representing that Value did not have any employees for the coverage period and did not engage in either waterproofing or stucco work.

The Policy issued to Value provides that the insurer's "determination regarding a defense obligation under this policy may be made on evidence or information <u>extrinsic</u> to any complaint or pleading presented to us." (Emphasis supplied.) The Policy also contains a section entitled "Commercial General Liability Coverage Declarations" in which the following

classifications are listed:

Dry Wall or Wallboard Installation

Masonry

Painting-Interior Buildings or Structures

Tile, Stone, Marble, Mosaic or Terrazzo Work-Interior Construction

In October of 2009, Value sought insurance for roofing work. Kaur's handwritten notes from that time indicate that Value had called to add "Residential" roofing coverage to the Policy. In response to a request by NYC Guardian, the Policy was amended to include an endorsement that added another classification. NYC Guardian's request indicated that Value planned "to do a roofing job for $1,500" that would last two days.

There are two categories of insurance coverage for roofing work: residential and commercial. The premiums for a residential roofing classification and for a commercial roofing classification are different. Atlantic Casualty's agent calculated Value's premiums on the basis of a residential roofing classification, which is the lower rate. Both NYC Guardian and Green Mountain understood that Value was seeking coverage for residential roofing work. There is no evidence that either Kaur on behalf of NYC Guardian or Lawrence on behalf

of Green Mountain discussed with each other the issue of whether Value wanted coverage for commercial or residential work. Instead, both relied on Value's representations earlier in 2009 that 100% of its work was residential as opposed to commercial construction work.  There is no evidence whether the roofing work that prompted Value to request this additional coverage in October 2009 was either residential or commercial.

On October 30, Green Mountain mailed an invoice for the roofing classification to NYC Guardian, indicating that the endorsement itself had been sent to the Excess Lines Association for acceptance and stamping and would be forwarded to NYC Guardian upon its return.  This process of acceptance and stamping ordinarily takes approximately two weeks.  Consistent with this timeline, Green Mountain mailed the endorsement adding the roofing classification to NYC Guardian on November 13.  The added roofing classification was written on an endorsement that is dated October 30, 2009, as follows:

"98678 ROOFING-RES.

EXPOSURE: P) 1,000"

Upon receiving an endorsement from an insurance company, it is NYC Guardian's ordinary practice to notify the insured promptly that the endorsement has arrived and that it may be picked up at the office.  Kaur testified that some insureds

11

request to have the original of the endorsement.  In such cases, NYC Guardian's procedures call for it to make a photocopy of the endorsement to maintain in NYC Guardian's files.  NYC Guardian's file does not contain either the original or a copy of the roofing endorsement.  A reasonable inference to be drawn from these facts is that the insured picked up the original of the roofing endorsement from NYC Guardian and NYC Guardian failed to make a photocopy for the file.  The defendants have submitted no evidence indicating that Value did not receive the endorsement.

The defendants point out that the roofing endorsement itself contains the designation "Policy Change Number 01," while the cover sheet indicating that the endorsement was mailed to NYC Guardian refers to "Endorsement 04."[2]  It is clear, despite the typographical error, that the endorsement issued for "ROOFING-RES." in October 2009 and the endorsement sent to NYC Guardian on November 19 are one and the same.  The roofing endorsement is the only endorsement issued under the policy that adds a classification.  It reflects an additional premium of $346.  Green Mountain's internal Change Worksheet, which describes the "Roofing - Resd" classification, indicates that

---

[2] The first three endorsements excluded coverage for waterproofing and stucco work, reflect Value's nonpayment of a premium, and the reinstatement of the Policy.  The fourth endorsement is the first to add coverage for a new classification.

the pro-rata premium for this added classification is $346 and identifies the endorsement as "Endorsement #04."  This premium amount is consistent with the invoice sent to NYC Guardian on October 28, in response to NYC Guardian's request for the addition of a roofing endorsement.

On April 22, 2011, Greenwich, which had made payments on KFC's claims, initiated a subrogation action against Value in New York State Supreme Court.  Atlantic Casualty is not a party to the subrogation action, but is providing Value's defense in that suit.  The subrogation suit's complaint asserts claims for breach of contract and negligence arising out of Value's work on the Property and the partial collapse.

On October 26, 2011, Atlantic Casualty initiated a declaratory judgment action against the defendants in this Court.  In its complaint, Atlantic Casualty claims it is not required to indemnify or defend Value because: 1) the loss at issue is not an "occurrence," as required by the Policy; 2) Value's work did not fall within the Policy's classifications; 3) the loss at issue is excluded by the Contractual Liability Exclusion; 4) the loss is excluded by one or more of the "Property Damage" exclusions in the Policy; and 4) Atlantic Casualty was prejudiced by the late notice it received of the alleged occurrence.

13

DISCUSSION

1. Choice of Law

The parties have not addressed the issue of which law applies to this contractual dispute.  The parties' memoranda of law and their proposed conclusions of law, however, apply New York law.  "Federal courts sitting in diversity look to the choice-of-law rules of the forum state."  Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co., 363 F.3d 137, 143 (2d Cir. 2004).  Pursuant to New York's choice-of-law rules, an agreement between the parties to apply New York law, even where that agreement is implicit, is sufficient to establish the appropriate choice of law.  Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000); see also Fed. Ins. Co. v. Am. Home Assur. Co., 639 F.3d 557, 566 (2d Cir. 2011).  Accordingly, the Court will apply New York law.

2. Duty to Indemnify and Duty to Defend

Atlantic Casualty seeks a declaration with respect to two separate duties: its duty to defend Value and its duty to indemnify Value.  An insurer has distinct duties to indemnify and to defend its insured.  The duty to defend is broader than the duty to indemnify.  See Fieldston Prop. Owners Ass'n, Inc. v. Hermitage Ins. Co., Inc., 16 N.Y.3d 257, 264 (2011).  The duty to defend "is measured against the allegations of pleadings

14

but the duty to pay is determined by the actual basis for the insured's liability to a third person." Servidone Const. Corp. v. Sec. Ins. Co. of Hartford, 64 N.Y.2d 419, 424 (1985).

An insurer's duty to defend its insured is a contractual obligation.  Town of Massena v. Healthcare Underwriters Mut. Ins. Co., 98 N.Y.2d 435, 444 (2002).  To ascertain whether the duty to defend has been triggered, a court will ordinarily compare the allegations of the complaint to the insurance policy's terms.  Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp., 302 F.3d 83, 97 (2d Cir. 2002); Odgen Corp. v. Travelers Indemn. Co., 924 F.2d 39, 41 (2d Cir. 1991).  Generally, where allegations in a complaint fall within the scope of the risks undertaken by the insurer, regardless of how false or groundless those allegations might be, there is a duty to defend.  Century 21, Inc. v. Diamond State Ins. Co., 442 F.3d 79, 82 (2d Cir. 2006).

In order for an insurer to be relieved of the duty to defend, there must be "no possible factual or legal basis on which an insurer's duty to indemnify under any provision of the policy could be held to attach."  Id. at 82-83 (citation omitted).  Since the duty to defend is a purely contractual obligation, however, parties to an insurance contract may modify the duty to defend.  See Allianz Ins. Co v. Lerner, 416 F.3d

15

109, 117 (2d Cir. 2005).  They may, for instance, agree that extrinsic evidence may be considered in an examination of the duty to defend.  Pendergest-Holt v. Certain Underwriters at Lloyd's of London, 600 F.3d 562, 574 (5th Cir. 2010)(parties to insurance contract could modify eight-corners rule and permit consideration of extrinsic evidence).  Because the Policy expressly contemplates that extrinsic evidence will be considered, extrinsic evidence may be used in assessing Atlantic Casualty's duty to defend.

Under New York law, insurance contracts are interpreted "to give effect to the intent of the parties as expressed in the clear language of the contract."  Ment. Bros. Iron Works Co., Inc. v. Interstate Fire & Cas. Co., No. 11 Civ. 2596, 2012 WL 6124151, at *3 (2d Cir. Dec. 11, 2012); see also Village of Sylvan Beach, N.Y. v. Travelers Indemn. Co., 55 F.3d 114, 115 (2d Cir. 1995).  The insured party bears the burden of establishing that the claimed loss falls within the scope of the policy.  Consol. Edison Co. of N.Y. v. Allstate Ins. Co., 98 N.Y.2d 208, 218 (2002).  If the insurer seeks to disclaim coverage on the basis of a policy exclusion, however, the insurer must prove that "the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation and applies in the particular case."  Continental

16

Cas. Co. v. Rapid-Am. Corp., 80 N.Y.2d 640, 652 (1993).

The threshold question of whether a contractual term or clause is ambiguous is a question of law. Haber v. St. Paul Guardian Ins. Co., 137 F.3d 691, 695 (2d Cir. 1998). Language in an insurance contract is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Olin Corp. v. Am. Home Assur. Co., No. 11 Civ. 4055, 2012 WL 6602909, at *6 (2d Cir. Dec. 19, 2012)(citation omitted); In re Prudential Lines Inc., 158 F.3d 65, 77 (2d Cir. 1998). Contract language is unambiguous if it "provides a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." Olin Corp., 2012 WL 6602909, at *6 (citation omitted). If a court determines that the terms at issue are unambiguous, the terms are given their plain and ordinary meaning and the court will not consider extrinsic evidence in aid of assigning meaning to these terms. Id.; In re Prudential Lines Inc., 158 F.3d at 77; see also Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London,

England, 136 F.3d 82, 86 (2d Cir. 1998).  If, on the other hand, a court determines that contract language is ambiguous, it may consider "any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract."  Alexander & Alexander Servs., Inc., 136 F.3d at 86; see also British Int't Ins. Co. Ltd. V. Seguros La Republica, S.A., 342 F.3d 78, 82 (2d Cir. 2003).  Ambiguity in the language of the insurance contract that is not resolved by consideration of available extrinsic evidence is construed against the insurer and in favor of the insured.  In re Prudential Lines Inc., 158 F.3d at 77; see also Haber, 137 F.3d at 697.  This principle applies "regardless of whether, as to a particular clause, the burden of proof falls on the insurer or the policyholder."  Ment. Bros. Iron Works Co., 2012 WL 6124151, at *4.

3. Late Notice

    Atlantic Casualty asserts that it is relieved of the duties to defend and indemnify Value because it did not receive notice of the loss until roughly six months after the collapse of the roof at the Property.  Under New York Insurance Law, an insurer may disclaim coverage if it did not receive timely notice in compliance with the policy's notice requirement and it was

prejudiced by the untimely notice.[3]   N.Y. Insur. Law. § 3420.
Notice provisions serve several functions.   These include
enabling insurers to conduct a timely investigation and to
maintain adequate reserves against losses.   Commercial Union
Ins. Co. v. Int'l Flavors & Fragrances, Inc., 822 F.2d 267, 271
(2d Cir. 1987).

        An insurance policy's requirement that an insured give
notice "as soon as practicable" following an occurrence or
accident has been interpreted to mean that "notice must be
provided within a reasonable time in view of all the facts and
circumstances."   Steinberger v. Hermitage Ins. Co., 809 N.Y.S.2d
569, 571 (2d Dept. 2006).   "The test for determining whether the
notice provision has been triggered is whether the circumstances
known to the insured at the time would have suggested to a
reasonable person the possibility of a claim."   Sparacino v.
Pawtucket Mut. Ins. Co., 50 F.3d 141, 143 (2d Cir. 1995).

_____

[3] In 2008, the New York legislature amended New York Insurance
Law to require the insurer, in cases in which notice is given to
the insurer within two years of the occurrence, to show that it
was prejudiced by the untimely notice.  See An Act to Amend the
Civil Practice Law and Rules and the Insurance Law, in Relation
to Liability Insurance Policies § 8, 2008 N.Y. Sess. Laws 388
(McKinney 2008).  Previously, New York courts had applied the
"no-prejudice" rule under which an insurer had only to prove
late notice and prejudice would be presumed.  The amendment to
the New York Insurance Law applies to insurance policies that
were issued or delivered after January 17, 2009.  The parties
agree that N.Y. Insurance Law § 3420(a)(5)'s prejudice
requirement applies to the Policy.

Accordingly, an insured can demonstrate that notice was timely
under the circumstances if the insured "lacked knowledge of the
occurrence or had a reasonable belief of nonliability."
Commercial Union Ins., 822 F.2d at 271.  When an insured is
unable to show "a reasonable excuse or mitigating factors, even
relatively short periods of delay have been found to be
unreasonable as a matter of law."  Kamyre Inc. v. St. Paul
Surplus Lines Ins. Co., 547 N.Y.S.2d 964, 967 (3d Dept.
1989)(citation omitted).  In fact, courts applying New York law
routinely hold that delays for one or two months are
unreasonable.  Am. Ins. Co. v. Fairchild Indus., Inc., 56 F.3d
435, 440 (2d Cir. 1995); see also Am. Home Assur., Co. v.
Republic Ins. Co., 984 F.2d 76, 78 (2d Cir. 1993); Deso v.
London Lancashire Indemn. Co., 3 N.Y.2d 127, 139 (1957).

    With respect to policies issued after January 17, 2009, an
insurer cannot disclaim coverage on the basis of untimely notice
unless the insurer was prejudiced by the late notice.  N.Y.
Insur. Law § 3420(a)(5).  When notice is given within two years
of the accident or occurrence, but is untimely, the insurer has
the burden of proving that it was prejudiced by the late notice.
N.Y. Insur. Law § 3420(c)(2)(A).  An insurer is prejudiced if
the failure to timely provide notice "materially impairs the
ability of the insurer to investigate or defend the claim."

                                20

N.Y. Insur. Law § 3420(c)(2)(C).

Under New York Insurance Law § 3420(a)(3), an injured party has an independent right to provide written notice of an accident or occurrence to an insurance carrier. If such notice is properly given, the fact that the insured party failed to give timely notice will not prevent the injured party from recovering against the insurer. Gen. Accident Ins. Group v. Cirucci, 46 N.Y.2d 862, 863-64 (1979). In order to take advantage of § 3420(a)(3), the injured party must prove that he or his agent "acted diligently in attempting to ascertain the identity of the insurer and, thereafter, expeditiously notified the insurer." Am. Home Assur. Co. v. State Farm Mut. Auto Ins. Co., 717 N.Y.S.2d 224, 225 (2d Dept. 2000).

Atlantic Casualty first received notice of the partial collapse at the Property over six months after it occurred. It is not disputed that its insured, Value, knew of the collapse within a few hours of its occurrence. It is also not disputed that KFC requested a certificate of insurance from Value in early March, that is, within days of the collapse. Neither Value nor KFC, however, acted to notify Atlantic Casualty of the loss until September 2, 2010, when KFC's insurance company mailed notice to Atlantic Casualty. This delay of roughly six months was unreasonable.

21

The defendants have offered two arguments to excuse this delay.  They argue that Value had a reasonable belief in nonliability because it appeared that the collapse of the roof was caused by the heavy snowfall.  When KFC reached out to Value to give it immediate notice of the roof's collapse, a collapse which occurred just days after Value had performed repair work on the roof structure, that notice would have suggested to any reasonable contractor that its work may be the subject of a claim.  Just a few days later, when KFC asked Value to provide it with a certificate of insurance, Value was again put on notice that KFC might seek to hold Value at least partially responsible for the roof's collapse.  Thus, no later than early March 2010, Value could no longer hold any reasonable belief of nonliability.

The defendants next argue that it was "impractical" for KFC to provide prompt notice to Atlantic Casualty because the demolition of the Property occurred so quickly after the collapse.  The prompt demolition of the second story and roof did not interfere in any way with the provision of notice or make it "impractical" to give notice.  This argument is best understood as a response to Atlantic Casualty's contentions that it was prejudiced by the delay in providing it with notice. But, KFC knew that Atlantic Casualty was Value's insurer by

22

March 9, and did not notify Atlantic Casualty of the partial
collapse until September 2.  Moreover, there were almost three
weeks between the roof collapse and the completion of the
demolition and over a week between March 9 and the completion of
the demolition.  Prompt notice by KFC to Atlantic Casualty would
have given Atlantic Casualty an opportunity to conduct an
investigation.  It was not, therefore, "impractical" to give
Atlantic Casualty notice of the collapse.

Atlantic Casualty has also shown that the late notice
materially impaired its ability to investigate the claim and
defend against it.  Although demolition of the Property
proceeded expeditiously following the partial collapse,
demolition of the second floor of the Property was not completed
until March 17, 2010.  It is also undisputed that Greenwich's
adjuster, U.S. Adjustment Corp., was able to inspect the
property on four occasions, with the last inspection occurring
on March 12.  The late notice prevented the plaintiff from being
able independently to ascertain potential causes of the
collapse, information which would be highly relevant to an
investigation and defense of a claim like the one made here.

The defendants argue that the plaintiff was not prejudiced
because it did little to investigate the loss after it received
notice of the partial collapse, and because ample discovery has

provided Atlantic Casualty "more than adequate information
concerning the facts associated with the collapse."  In
summation, they also argued that to carry its burden of showing
prejudice, Atlantic Casualty was required to demonstrate at this
trial precisely how its defense in the underlying subrogation
action has been impaired.  None of these arguments is
persuasive.

First, because the second story of the Property had been
demolished roughly six months before Atlantic Casualty received
notice, there were no meaningful investigatory steps that
remained available to it that it failed to take.  Nonetheless,
its investigator promptly communicated with Greenwich's counsel,
sought relevant photographs and documents, visited the Property
and interviewed Value's employee.  Nor has the existence of
litigation and its attendant opportunities for discovery removed
the prejudice to Atlantic Casualty.  Greenwich and Value are
adverse parties in the underlying subrogation action; the scope
of Value's repair work on the property, whether the repairs were
made negligently, and whether any deficient repairs proximately
caused the roof's collapse are central issues in that
litigation.  Because Atlantic Casualty did not receive timely
notice it must rely on its adversary's investigation to defend
its insured in the underlying action.

24

While Atlantic Casualty has not submitted evidence of the investigation done by KFC and its insurer before the demolition was completed, nor shown precisely how that investigation may have been biased or incomplete, it need not do so in order to carry its burden of showing prejudice.  It is not disputed that Atlantic Casualty had a right to inspect the remnants of the roof, the bow truss, the bottom chord, and the site of Value's repairs.  The defendants having denied Atlantic Casualty an opportunity to make that inspection, it is unreasonable to impose upon Atlantic Casualty the burden to show precisely how it would have been advantaged by that inspection.  Moreover, when the duty to defend is litigated on the ground that there was a failure to give timely notice, a decision will often be, and where possible should be, rendered in the absence of any significant progress in the underlying subrogation action.  It does not promote judicial efficiency in either the subrogation or declaratory judgment actions, nor is it fair to the parties, to delay a decision on the duty to defend until the subrogation action has sufficiently advanced to fully develop the record on all issues related to a negligence claim.  Here, where the best physical evidence was available to only one side but not the other because of an unreasonable failure to provide notice, prejudice has been shown.

25

The plaintiff has therefore satisfied its heavy burden of demonstrating that it does not have a duty to defend Value in the underlying subrogation action.  Because the plaintiff has shown that it was prejudiced by the late notice it received, there is "no possible factual or legal basis on which an insurer's duty to indemnify under any provision of the policy could be held to attach."  Century 21, Inc., 442 F.3d at 82-83 (citation omitted); see, e.g. Commercial Union Ins. Co., 822 F.2d at 272-73 (no duty to either defend or indemnify); State of N.Y. v. Blank, 27 F.3d 783, 793-94 (2d Cir. 1994)(abrogated on other grounds)(same); Red Apple Co., Inc. v. Scottsdale Ins. Co., 269 A.D.2d 208, 208 (1st Dept. 2000)(same).

4. Classifications

Although the failure to give Atlantic Casualty timely notice, and the prejudice suffered by Atlantic Casualty from that failure, is sufficient to relieve Atlantic Casualty of both the duty to defend and to indemnify, this Opinion will address one additional contention of the parties as well.  Atlantic Casualty has also shown that the work Value performed at the Property was not covered by its Policy.

The parties initially dispute who has the burden of proving that Value's repair work did or did not fall within the Policy's classifications.  It is black letter law that the insured has

26

the burden of proving that the claimed loss falls within the scope of the policy but the insurer has the burden of proving that a policy exclusion applies.  Consol. Edison Co. of N.Y., 98 N.Y.2d at 218.  Thus, the parties debate whether the Policy's classifications demarcate the scope of coverage or instead constitute exclusions from coverage.

"Determining whether there is no coverage by reason of exclusion as opposed to lack of inclusion can be problematic." NGM Insur. Co. v. Blakely Pumping, Inc., 593 F.3d 150, 153 (2d Cir. 2010)(citation omitted).  This is because "[a]ny language providing coverage for certain events of necessity implicitly excludes other events."  Consol. Edison of New York, Inc., 98 N.Y.2d at 219.  In distinguishing between exclusions and lack of coverage courts should consider whether the claimed loss "was initially covered by the policy and only became uncovered upon the happening of a subsequent event," or whether it was never covered in the first place.  NGM Insur. Co., 593 F.3d at 154 (citation omitted).

Applying these principles, the Policy's classifications demarcate the scope of coverage and should not be read as exclusions.  The Policy provides that "[t]his insurance does not apply to and no duty to defend is provided for . . . 'property damage' . . . unless the . . . 'property damage' arises out of

the classification(s) shown on the Commercial General Liability Coverage Declarations."  Value's Policy includes five classifications 1) Dry Wall or Wallboard Installation; 2) Masonry; 3) Painting-Interior Buildings or Structures; 4) Tile, Stone, Marble, Mosaic or Terrazzo Work-Interior Construction; and 5) ROOFING-RES.  The premium levels for the Policy were set by this list of covered work; Value paid an additional premium amount to obtain coverage of "ROOFING-RES."  As a result, Value bears the burden of showing that its work is covered by the Policy.

The natural reading of the classifications is that the work Value performed at the Property fell outside of these five categories and thus was never covered by the Policy.  It is undisputed that the work Value performed at the Property does not fall within the "Dry Wall or Wallboard Installation" classification, the "Masonry" classification, or the "Painting -- Interior Buildings of Structures" classification.  The parties do dispute, however, whether Value's work falls within the "Tile, Stone, Marble, Mosaic or Terrazzo Work-Interior Construction" classification or the "ROOFING-RES." classification.

The defendants' argument that Value's work falls within the "Tile, Stone, Marble, Mosaic or Terrazzo Work-Interior

Construction" classification is meritless.  In support of their argument, the defendants detach the words "Interior Construction" from the words that precede it.  The defendants argue that because Value's work included "Interior Construction" it is covered by this classification even though no one contends that Value's work involved any "Tile, Stone, Marble, Mosaic or Terrazzo Work."  In effect, the defendants are arguing that this single classification constitutes two classifications, one for tile, stone, marble, mosaic and terrazzo work and another distinct classification for interior construction in general. Fairly read, the classification refers to interior construction that involves tile, stone, marble, mosaic or terrazzo work. That is the natural and unambiguous meaning of the classification.  Courts must not accept interpretations that "would strain the contract language beyond its reasonable and ordinary meaning."  Fed. Ins. Co., 639 F.3d at 568 (citation omitted).  As a result, the claimed loss arising out of Value's work -- which it is undisputed did not involve tile, stone, marble, mosaic or terrazzo work -- is not covered by this classification.

In summation, the defendants argued that the phrase "Interior Construction" must be read independently of the rest of the classification in order to give effect to the word

"Construction."  Following this argument, they suggest that the Policy could have used the word "Interior" alone to describe the type of tile, stone, marble, mosaic or terrazzo work covered by the classification and to exclude exterior construction work. In other words, by creating the term "Interior Construction," the Policy added a separate category covering all construction work in the interior of a building.  This argument also fails. As already noted, the natural reading of the classification is that it covers interior construction work using the listed building materials.  Delinking the term "Interior Construction" from those materials does violence to both clauses and to the entire classification.  Applying the defendants' reading would permit coverage of both interior and exterior work involving each of the materials, as well as coverage of all interior construction work, a result clearly inconsistent with the plain meaning of the classification.

Whether Value's work at the Property constituted "ROOFING-RES." requires a more extended discussion.  The parties dispute whether the work performed by Value was roofing work and whether the Policy restricted its coverage to residential roofing work. The defendants contend that the repair work performed by Value on the truss is understood within the industry to be roofing work and that the term "RES." is reasonably susceptible to more

than one reading.  See In re Prudential Lines Inc., 158 F.3d at
77.  As the defendants point out, the standard abbreviation for
"residential" is "RESD."  The defendants suggest that the
abbreviation "RES." could be simply some kind of arbitrary
insurance code or could also refer to "restoration" among other
words.  The plaintiff asserts that Value's work was not roofing
work, which it contends refers solely to work on the impermeable
barrier and its roof deck, but not on a roof truss, and that in
any event, the classification applied only to residential
roofing work.

     The defendants have shown that the term "roofing" in this
classification covers work performed on a bottom chord of a bow
truss that supports a roof.  While fabrication of a bow truss is
work customarily performed by carpenters, a bow truss is an
essential component of a roof structure and its repair would be
understood to be work on a roof structure or roofing work.

     The defendants have not shown, however, that this
classification covers the work performed by Value at the
Property.  The term "RES." is, in the context of an insurance
policy such as this, unambiguous and refers to residential as
opposed to commercial roofing work.  But, even if the
abbreviation "RES." is deemed to be ambiguous, it nonetheless is
clear, based on an examination of extrinsic evidence, that Value

sought and obtained insurance coverage only for residential roofing work.

The trial evidence establishes that the parties intended the Policy's classification to include residential roofing work and not commercial roofing work. The most powerful evidence is Value's own insurance application. In the application, Value was asked to indicate what percentage of its construction work is residential and what percentage is commercial. Value indicated that 100% of its construction work is residential. There is no evidence that Value ever communicated to its broker or to Atlantic Casualty that its work would ever include commercial construction work. Kaur, Value's brokerage agent, believed that Value was seeking the addition of a residential roofing classification. Under New York insurance law and common law, "insurance brokers act as agents on behalf of the insured where they are employed by the insured to procure insurance." Evvtex Co., Inc. v. Hartley Cooper Assocs. Ltd., 102 F.3d 1327, 1331-32 (2d Cir. 1996)(citation omitted). A principal is bound by the actions of its agent whenever the agent acts within the ambit of his authority. See Fennell v. TLB Kent Co., 865 F.2d 498, 502 (2d Cir. 1989); British Am. & Eastern Co., Inc. v. Wirth Ltd., 592 F.2d 75, 80 (2d Cir. 1979); Ruggles v. Am. Cent. Ins. Co., 114 N.Y. 415, 421 (1889). Kaur, Value's insurance

broker, was undisputedly an agent of Value and was authorized to request an additional classification on Value's behalf.  Kaur understood Value to be requesting a residential roofing classification, believed she was requesting a residential roofing classification, and believed that Atlantic Casualty's agent would understand her request as a request for a residential roofing classification.  If the nature of Value's work had changed such that Value no longer performed exclusively residential construction work, Kaur expected Value to inform her of that change.  Indeed, had Value sought and obtained coverage for commercial roofing work it would have been charged a higher premium.  Fairly read, therefore, this classification provides coverage for residential roofing.

Because it is undisputed that the Property on which Value performed work was not residential, there is "no possible factual or legal basis on which an insurer's duty to indemnify under any provision of the policy could be held to attach." Century 21, Inc., 442 F.3d at 82-83 (citation omitted). Accordingly, for this additional reason, the plaintiff is entitled to a declaration that it does not have a duty to defend Value in the underlying subrogation action.

The defendants make two additional arguments in support of their contention that the classification covered Value's work.

33

First, they argue that Atlantic Casualty's underwriting manual
required Green Mountain to conduct an inspection of the
insured's business whenever it issued a policy with a roofing
classification, and Atlantic Casualty cannot now deny coverage
without having conducted that inspection.  The Atlantic Casualty
underwriting manual on which Green Mountain relied in issuing
the roofing classification for Value indicated that Green
Mountain could "bind any risk up to $20,000 in premium . . .
subject to the terms and conditions contained in this manual."
The manual's notes to the "Roofing - residential" classification
indicated, inter alia, "[i]nspection required."  It is not clear
whether the manual requires an inspection when an endorsement is
issued to add a roofing classification to an existing policy.
But even if it does, the defendants have not offered evidence to
show what an inspection of Value's roofing work in October 2009,
at the time Value obtained the endorsement, would have shown.
The defendants have not shown, for instance, that such an
inspection would have put Atlantic Casualty on notice that Value
was doing roofing work at a commercial property.  Moreover, the
failure of Atlantic Casualty's agent Green Mountain to order an
inspection does not alter the scope of the coverage.  The Policy
is a contract and the defendants have not pointed to any term of
the Policy which conditioned its performance on Atlantic

34

Casualty or Atlantic Casualty's agent following internal
underwriting guidelines.

Next, the defendants contend that the endorsement should be
read as restricting the coverage for roofing work to residential
roofing work.  As a restriction on coverage, they argue, it is
not enforceable unless the endorsement was received by the
insured or its broker.  This argument fails for two independent
reasons.  Through its agent, Value sought coverage for
residential roofing work.  As a result, the endorsement did not
restrict coverage to less than the insured had requested.  And,
as described above, Green Mountain sent the endorsement to NYC
Guardian, and NYC Guardian provided it to Value.  Tellingly,
Value provided no evidence that it did not receive the
endorsement in or about November 2009, shortly after it had been
received by NYC Guardian.  Since the plaintiff prevails on two
of its arguments, it is unnecessary to address its remaining
grounds for a denial of coverage.

5. Propriety of Declaratory Judgment

Finally, it is necessary to address the defendants'
contention that the issue of the plaintiff's duty to indemnify
Value is not ripe for resolution in this declaratory judgment
action.  Pursuant to the Declaratory Judgment Act,

in a case of actual controversy within its

35

> jurisdiction, . . . any court of the United States,
> upon the filing of an appropriate pleading, may
> declare the rights and other legal relations of any
> interested party seeking such declaration, whether or
> not further relief is or could be sought.

28 U.S.C. § 2201.  The words "case of actual controversy"
incorporate the ripeness requirements of Article III.
MedImmune, Inc. v. Genetech, Inc., 549 U.S. 118, 126-27 (2007).

A declaratory judgment action is ripe for adjudication if
"the facts alleged, under all the circumstances, show that there
is a substantial controversy, between parties having adverse
legal interests, of sufficient immediacy and reality to warrant
the issuance of a declaratory judgment."  In re Prudential Lines
Inc., 158 F.3d at 70 (citation omitted).   Although federal
courts are prohibited from opining on abstract questions, the
Second Circuit has recognized that "[t]he difference between an
abstract question and a 'controversy' contemplated by the
Declaratory Judgment Act is necessarily one of degree."  Certain
Underwriters at Lloyd's London v. St. Joe Minerals Corp., 90
F.3d 671, 675 (2d Cir. 1996)(citation omitted).  Thus, the fact
that "liability may be contingent does not necessarily defeat
jurisdiction of a declaratory judgment action."  Assoc. Indem.
Corp. v. Fairchild Indus., Inc., 961 F.2d 32, 35 (2d Cir. 1992).
Instead, courts should take into account "the practical
likelihood that the contingencies will occur."  Id. (citation

omitted).  Even if a case presents an active controversy,
however, the court has discretion to decline to exercise its
jurisdiction under the Declaratory Judgment Act.  The Second
Circuit has instructed that in assessing the appropriateness of
declaratory relief, courts should consider

> (1) whether the judgment will serve a useful purpose
> in clarifying or settling the legal issues involved;
> and (2) whether a judgment would finalize the
> controversy and offer relief from uncertainty.

Dow Jones & Co. v. Harrods, Ltd., 346 F.3d 357, 359 (2d Cir.
2003).

Courts often distinguish between the duty to defend and the
duty to indemnify in determining whether each issue posed in a
declaratory judgment action is ripe for adjudication.  See e.g.,
Columbia Cas. Co. v. Georgia & Florida RailNet, Inc., 542 F.3d
106, 110-11 (5th Cir. 2008); Lear Corp. v. Johnson Elec.
Holdings Ltd., 353 F.3d 580, 583 (7th Cir. 2003); Nationwide
Ins. v. Zavalis, 52 F.3d 689, 693-94 (7th Cir. 1995); see also
Couch on Insurance, § 227:27 Duty to Defend Versus Duty to Pay
in Third-Party Liability Cases (2012).  This distinction arises
from the fact that the duty to defend is triggered by the filing
of a lawsuit while the duty to indemnify is triggered by a
determination of liability.  Columbia Cas., 542 F.3d at 110-11.
Accordingly, courts may issue a declaratory judgment on the duty

37

to defend, while holding that the duty to indemnify is not ripe
for adjudication.   There is no per se rule, however, that all
declaratory judgment actions brought to establish a duty to
indemnify are premature during the pendency of an underlying
action.   See generally Maryland Cas. V. Pac. Coal & Oil Co., 312
U.S. 270 (1941) (petitioner's declaratory judgment action
seeking declaration of petitioner's duty to defend and duty to
indemnify constituted actual controversy within meaning of
Declaratory Judgment Act); see also Am. States Ins. Co. v.
Kearns, 15 F.3d 142, 144-45 (9th Cir. 1994).

      Central to the reasoning of courts that distinguish between
the justiciability of the duty to defend and the duty to
indemnify are the different degrees of factual investigation
that the two inquiries entail.   See e.g., Columbia Cas. Co., 542
F.3d at 110-11; Nationwide Ins., 52 F.3d at 693-94.   Courts are
concerned about becoming entrenched in a factual quagmire that
has yet to be resolved in the underlying litigation.   Nationwide
Ins., 52 F.3d at 693-94.   Because the duty to defend is often
decided on the basis of the four corners of the underlying
complaint and the terms of the insurance policy, it can
frequently be resolved without factual investigation.   See id.
at 693-94.   In contrast, the duty to indemnify, which is
contingent on the insured's liability, often requires

consideration of the factual disputes that are also at issue in the underlying action.  See Columbia Cas. Co., 542 F.3d at 110-11; see also Law and Practice of Insurance Coverage Litigation, § 12:11 Use of declaratory judgment actions to litigate coverage during pendency of tort suit – Duty to indemnify (2012).

Nonetheless, despite the practical differences between the duty to defend and the duty to indemnify, a decision on the duty to defend will sometimes produce a definite answer with respect to the duty to indemnify as well.  See, e.g., Columbia Cas. Co., 542 F.3d at 110-11; United Nat. Ins. Co. v. Dunbar & Sullivan Dredging Co., 953 F.2d 334, 338 (7th Cir. 1992).  Moreover, to the extent that the questions about insurance coverage which arise in the declaratory judgment action can be separated from the issues of liability and causation that are being litigated in the underlying lawsuit, there is far less reason to withhold judgment on the question of indemnification.

There is no doubt that the parties' dispute over the plaintiff's duty to defend Value in the underlying subrogation action is an active controversy.  Atlantic Casualty, having reserved its right to challenge the existence of its duty to defend, is currently providing Value with a defense in the underlying action.

It is also appropriate to reach the question of the

plaintiff's duty to indemnify Value.  First, the determination
that Atlantic Casualty has no duty to indemnify Value arises
from the same determinations that conclude it has no duty to
defend Value.  As a result, a ruling on the former issue does
not require more extensive fact finding than the determination
on the latter.  Second, neither of the two alternative grounds
for finding that Atlantic Casualty has no duty to defend or
indemnify Value -- the late notice and the Policy's coverage --
implicate any disputed question of fact about the quality of
Value's repair work or the role that work may have played in the
roof's collapse.  As a result, it is appropriate to declare at
this time the scope of Atlantic Casualty's duty to defend and to
indemnify Value.

CONCLUSION

     The plaintiff's request for a declaratory judgment that it
does not have a duty to defend or indemnify Value is granted.
Accordingly, Value's counterclaims are denied.  The Clerk of
Court shall enter judgment for the plaintiff and close the case.


Dated:    New York, New York
          January 15, 2013


                          _____
                                 DENISE COTE
                          United States District Judge